**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| QUEEN OF VIRGINIA SKILL & ENTERTAINMENT, LLC, POM OF VIRGINIA, LLC, and MIELE MANUFACTURING, INC., <br><br>     Plaintiffs, <br><br> v. <br><br> JOSEPH D. PLATANIA, in his official capacity as Commonwealth's attorney for the City of Charlottesville, <br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 3:19-cv-00065<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiffs Queen of Virginia Skill & Entertainment, LLC ("Queen of Virginia"), POM of Virginia, LLC ("POM VA"), and Miele Manufacturing, Inc. ("Miele Manufacturing") (collectively, "Plaintiffs"), through the undersigned counsel, state as follows for their First Amended Complaint, filed as of right pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and/or by Order of this Court (ECF No. 7) against Defendant Joseph D. Platania ("Defendant"), in his official capacity as Commonwealth's attorney for the City of Charlottesville:

**<u>INTRODUCTION</u>**

1.    For over two years, Plaintiffs have offered a legal, electronic game of skill in the Commonwealth without issue. Plaintiffs contract with retail locations that house the game in Department of Alcoholic Beverage Control ("ABC")-licensed restaurants, bars, and convenience stores and are subject to a strict standard of conduct. In determining that their game is legal and not an unlawful gambling device, Plaintiffs had the game examined by an independent laboratory

1

which determined that its outcome depended predominantly on skill rather than chance and therefore could not be an illegal gambling device under Virginia law. Plaintiffs relied on these expert analyses, the design of the software, advice of numerous counsel, Virginia Attorney General opinions, and a common sense understanding of the Virginia gaming statutes that games, where skill is determinative of successful play, are not illegal gambling. Prior to distributing the game in the Commonwealth, Plaintiffs submitted the game to the ABC, which determined, based on information provided by Plaintiffs, and with the advice of the Attorney General's office, that the game was predominantly skill-based. Plaintiffs met with numerous Commonwealth's attorneys throughout the Commonwealth, including the former Commonwealth's attorney for the City of Charlottesville, who stated that he had no problems with the game. Plaintiffs assembled a team of former law enforcement officials to ensure compliance with the relevant laws and regulations before offering the game to retailers at restaurants, bars, and convenience stores in the Commonwealth, including those in Charlottesville.

2.      However, on the afternoon of Friday, June 7 of this year, Defendant issued a press release announcing his intention to prosecute retailers housing Plaintiffs' skill game because he "determined" that the game is an illegal gambling device, despite existing law and government decisions to the contrary. As a direct result of Defendant's actions, games that are located in retail locations in Charlottesville have been unplugged and removed from their premises out of fear that Defendant will prosecute these retail locations. Thus, Plaintiffs' ability to continue doing business is impaired. Defendant's attempt to enforce an inapplicable gambling statute to prevent the distribution of the game in the Commonwealth is improper and threatens Plaintiffs' fundamental property and liberty rights to pursue a lawful trade or occupation without arbitrary

harassment and interference, as well as their procedural due process rights. This Court should issue declaratory and/or injunctive relief, and/or a writ of prohibition to suspend  as a result of Defendant's actions, which are *ultra vires*, and unconstitutional under the Virginia Constitution.

## THE PARTIES

3.      Queen of Virginia is a Wyoming limited liability company, with offices in Richmond, Virginia and Duluth, Georgia. It is duly authorized to transact business in the Commonwealth of Virginia. Queen of Virginia owns and distributes the terminal and game known as Queen of Virginia Skill & Entertainment (the "Game").

4.      POM VA is a Wyoming limited liability company, with its principal place of business in Duluth, Georgia. It is duly authorized to transact business in the Commonwealth of Virginia. POM VA licenses to Queen of Virginia the software that comprises the Game.

5.      Miele Manufacturing is a Pennsylvania corporation, with a principal place of business in Williamsport, Pennsylvania. Miele Manufacturing manufactures and sells the hardware (game terminal, cabinet, electronics, screen, etc.) that comprise the Game.

6.      Defendant is the Commonwealth's attorney for the City of Charlottesville. He is sued in his official capacity.

## JURISDICTION AND VENUE

7.      This Court retains subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1441.  If this case is remanded, the Charlottesville Circuit Court would have subject matter jurisdiction over this dispute pursuant to Va. Code § 17.1-513.

8.      If this case is remanded, the Charlottesville Circuit Court would have personal jurisdiction over Defendant as a citizen and government official of the Commonwealth of Virginia and/or pursuant to Va. Code § 8.01-328.1(A)(1).

3

7.      Defendant removed this action from the Circuit Court for the City of Charlottesville to this Court on or around October 15, 2019 because Plaintiffs' original complaint raised a federal question under 28 U.S.C. § 1331. [ECF No. 1, at ¶¶ 5-6].

8.      Plaintiffs' First Amended Complaint does not raise a federal question and states no claims under the Constitution or laws of the United States. As a result, this Court should exercise its discretion to remand this action to the Charlottesville Circuit Court. Plaintiffs intend, upon the filing of the First Amended Complaint, to move for a remand of this action.

## FACTS

9.      Plaintiffs manufacture, distribute, and maintain the Queen of Virginia Skill & Entertainment game ("the Game"), a skill game machine that is available as either a table-top device or standalone cabinet.

10.      The game begins when the player inserts money into a bill acceptor at the front of the game terminal. That generates a tic-tac-toe style puzzle in which the game spins nine reels in a 3x3 grid. When the reels stop spinning, the player has thirty seconds to select which of the nine cells should be changed to a wild symbol to create a chain of three identical symbols, either horizontally, vertically, or diagonally. The goal is to place the wild symbol in a cell to create at least one chain of three like symbols, as in tic-tac-toe.

11.      Whether one spot is more advantageous than another depends on the value of the symbols for which a chain of three was created. There may exist multiple possible solutions in which a chain of three is created, and it is up to the player to select, within thirty seconds, which cell is the most advantageous for the wild symbol.

12.      If the player does not select a wild symbol within thirty seconds, the player will lose.

13. The game will never generate a puzzle in which the player automatically wins without selecting a wild symbol for the correct spot in the grid.

14. Upon successfully creating a chain (or chains) of three symbols, the player will be awarded points depending on the symbols that comprise the chain or chains of three created by the successful player.

15. The player must correctly solve the tic-tac-toe puzzle in order to win and must choose the correct solution in order to maximize his or her awards.

16. By using the "preview" feature, a player can see the next tic-tac-toe puzzle that is available for play before paying the purchase price for the game. If the player changes to a different game theme or increases or decreases his or her play level, then a different tic-tac-toe puzzle will appear in the preview screen. By utilizing the preview feature, a player can toggle back and forth between game themes and purchase levels to choose the most advantages tic-tac-toe puzzle to solve. Moreover, the preview feature eliminates chance altogether because the player can view and study the puzzle (and determine the amount he or she would be awarded for correctly solving the puzzle) prior to paying any money to play the game.

17. Some of the tic-tac-toe puzzles cannot be solved by placing a wild card in any of the available locations and some of the tic-tac-toe puzzles, when correctly solved, award a player less than the purchase price of the game. If the player fails to recover at least 104% of the purchase price to play the game, the player moves on to a "Follow Me" phase, a "Simon"-style memory game featuring nine colored dots on the screen in a 3x3 grid. The system lights one dot up and makes a sound, which the player must match by touching the corresponding dot. The system then adds additional dots in progressively longer sequences that the player must repeat. Each dot is associated with a distinct sound and color, which the skillful player can use to match

the pattern. If the player successfully completes 25 sequences without missing a dot, the player will be assured a total prize of 104% of the purchase price to play the Game. In other words, a skillful player who successfully completes the Simon Says memory game is guaranteed to be awarded more than the purchase price of the game every time. However, if the player is not skillful and misses a dot or touches an incorrect dot, the Follow Me portion of the game will terminate without any award. As a result, if a player shows enough skill, the player can win each and every puzzle. Winning is not left to mere chance.

18.     Successful players of the Game will be paid out in credits, with one credit representing one cent. At any point, the player can redeem the credits won by utilizing the ticket printer on the machine and exchanging the ticket for cash at the location.

19.     The Game is always played in the same way, is not connected to the Internet, cannot be altered by the retail locations that host the game, and is not subject to modification by any other operator or third party. There is no factual dispute as to the manner in which the Game is played or the operation of its software.

20.     The Game is decided predominantly on the basis of the skill of the player rather than probability or chance. Skillful players of the Game who can identify correct patterns in the tic-tac-toe puzzle in the limited time allotted and remember the sequence in the Follow Me phase will win more than less-skillful players, and a perfectly skillful player can always win at least 104% or more of the amount of consideration paid to play the Game every time. For this reason, the Game is not an illegal gambling device, and playing it does not constitute illegal gambling under Virginia's gambling statutes, Va. Code § 18.2-325 *et seq.*

21.     Beginning in 2016, Plaintiffs laid the groundwork to introduce the Game into the Commonwealth.

22.     First, Plaintiffs submitted the game to a legal review which concluded that the Game is not an illegal gambling device under Virginia law because skill predominates, following a line of Attorney General opinions finding that, where chance does not predominate in the outcome of the game, it is not gambling under Virginia law. (Exhibit A, Gentry Locke Letter). Plaintiffs also submitted the Game's software for third party review and analysis, which also concluded that it was a skill game in which chance did not predominantly determine the likelihood of success. (Exhibit B, Farley Report).

23.     Plaintiffs placed the Games in restaurants and other establishments licensed by the ABC.

24.     Plaintiffs sought assurances that the Game would not be treated as an illegal gambling device by the ABC in order to avoid exposing restaurants, bars, and convenience stores hosting the game from the potential loss of their ABC licenses for mistaken or misguided ABC enforcement. Accordingly, Plaintiffs submitted an inquiry to the ABC in 2017 seeking guidance as to whether the ABC would treat the Game as an illegal gambling device.

25.     On July 7, 2017, with advice from the office of the Attorney General, the ABC issued a letter to Plaintiffs in which the ABC's Deputy Chief, following review of materials provided by Plaintiffs, opined that "we don't think the element of chance is a predominant factor in winning a prize in this game. It is apparent that there is a significant element of skill involved." (Exhibit C, ABC Letter).

26.     The letter went on, describing the tic-tac-toe phase of the Game as depending "on the player's ability to spot the pattern and determine the best place to put the 'wild' to enhance his/her chances of a higher score." *Id.* Moreover, the letter noted that the Follow Me phase

"involves memory," and that, taken together, "skill is the predominant factor in the game rather than chance." *Id.*

27.     The letter concluded that the ABC would not "consider these machines, in their current configuration and intended use, to be gambling devices and no administrative charges will be initiated [by the ABC] against any licensee which utilizes the machines on their premises." *Id.*

28.     Following receipt of the letter from the ABC, Plaintiffs introduced the Game into ABC-licensed establishments in Virginia pursuant to contracts with retail locations that contain strict guidelines as to how the Games are to be used and advertised, thus ensuring compliance with the relevant law. By way of example, Plaintiffs will not permit the Game to be used or placed in any establishments that also allow illegal gambling, and further mandate that the retailers take every precaution to prevent the improper or illegal use of skill game terminals. Retailers are also contractually obligated to cooperate with any and all law enforcement inquiries and investigations, and to remove from their premises any game terminals that the ABC determines to be illegal.

29.     Under Plaintiffs' contracts with their retailers, the retailers are also subject to a strict code of conduct that governs the use and advertising of terminals that contain the Game.

30.     Plaintiffs have never permitted the Game to be played in establishments that allow illegal gambling devices or slot machines.

31.     Plaintiffs also hired former ABC officers as dedicated compliance officers to make sure that retail locations with the Game did not also host illegal games or slot machines.

32.     As they began to introduce the Game into the Commonwealth, Plaintiffs arranged meetings with Commonwealth's attorneys throughout the state to demonstrate the Game and

ensure that the Commonwealth's attorneys understood how the Game worked and operated as a skill game. Plaintiffs' team—which comprised a former Justice of the Supreme Court of Virginia, former Attorney General of Virginia, former Assistant United States Attorney, former ABC Board Member, former FBI and ABC special agents, and former Deputy Attorneys General of Virginia—met with numerous Commonwealth's attorneys prior to distributing the Game in their jurisdictions. Specifically, Plaintiffs met with former Charlottesville Commonwealth's attorney Dave Chapman ("Chapman"), who said he had no issue with the Game.

33.    Having conducted their due diligence and established the legality of the Game, Plaintiffs began distributing Game terminals in retail locations throughout the Commonwealth, including 30 or so locations in the City of Charlottesville.

34.    The Game has been successful, and since its introduction, it has generated significant tax revenue for the Commonwealth. The local retail locations in which Plaintiffs' games are located report increased business and sales and have come to rely on the revenue and increased sales generated from the Game. Moreover, Plaintiffs earmark a share of their revenue for charitable causes, and the Game has generated almost $450,000 in grants to non-profits in Virginia since its introduction into the Commonwealth.

35.    In January 2018, Defendant replaced Chapman as Charlottesville Commonwealth's attorney.

36.    At a May 20, 2019 Charlottesville City Council meeting, a resident asked whether Charlottesville allowed "slot machines."

37.    Around the same time, local news media had reported on the presence of Plaintiffs' games in the Charlottesville area. Various news stories misidentified the Games as "slot machines" that "slipped in the back door" through a "little loophole."

38.    A citizen who saw one of these news stories complained about the Games in an email to City Council and Defendant, in which she misidentified the Game as a "slot machine" and requested that Defendant and/or City "challenge[] their presence in court."

39.    Mounting political pressure on Defendant to "do something" culminated in Defendant issuing an erroneous press release on Friday afternoon on June 7, 2019. In the press release, Defendant asserted that the office of the Charlottesville Commonwealth's attorney has "made the determination that these 'Queen of Virginia' machines are gambling devices and therefore violate Virginia Law." This "determination" is contrary to existing Virginia law and prior determinations by government officials in Virginia as to the legality of Plaintiffs' Game.

40.    Defendant then issued an ultimatum that retail locations housing terminals with the Game must remove the Game from their premises no later than July 7, 2019 or otherwise face prosecution for a Class 1 Misdemeanor carrying potential penalties of up to 12 months' jail time and a fine of $2,500.

41.    The Daily Progress immediately reported Defendant's press release in a story headlined "Charlottesville to ban 'skill machines'" and the lede "Soon, 'skill machines' will no longer be legal in Charlottesville, following a letter from the city's commonwealth attorney." The local television stations ran similar stories.

42.    The news of Charlottesville "banning" skill games spread across the Commonwealth, damaging and threatening Plaintiffs' business in other jurisdictions.

43.    In a seemingly odd coincidence, on the same day as Defendant's press release, the Governor of Virginia was in Charlottesville announcing the award of economic incentives to a slot machine manufacturer located in Albemarle County, less than a mile from the City limits, whose manufactured games are pure games of chance requiring no skill whatsoever. This story

10

about a slot machine manufacturer receiving government aid was on the front page of the Daily

Progress directly beside the story about Defendant "banning" Plaintiffs' *skill* games from the

City of Charlottesville.

44.     In his press release, Defendant claimed that his decision with respect to Plaintiffs'

skill-based Game was based on a "review" of Va. Code §§ 18.2-325 and 331.

45.     Va. Code § 18.2-325 provides, in relevant part:

> 1.   "Illegal gambling" means the making, placing or receipt of any bet or wager in the Commonwealth of money or other thing of value, made in exchange for a **chance** to win a prize, stake or other consideration or thing of value, dependent upon the result of any game, contest or any other event the outcome of which is **uncertain or a matter of chance**, whether such game, contest or event occurs or is to occur inside or outside the limits of the Commonwealth.
>
> . . .
>
> 3. "Gambling device" includes:
>
> a. Any device, machine, paraphernalia, equipment, or other thing, including books, records and other papers, which are actually used in an illegal gambling operation or activity, and
>
> b. Any machine, apparatus, implement, instrument, contrivance, board or other thing, or electronic or video versions thereof, including but not limited to those dependent upon the insertion of a coin or other object for their operation, which operates, either completely automatically or with the aid of some physical act by the player or operator, in such a manner that, **depending upon elements of chance**, it may eject something of value or determine the prize or other thing of value to which the player is entitled . . .

(emphasis added).

46.     Va. Code §18.2-331 provides:

> A person is guilty of illegal possession of a gambling device when he manufactures, sells, transports, rents, gives away, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of any gambling device, believing or having reason to believe that the same is to be used in the advancement of unlawful gambling activity. Violation of any provision of this section shall constitute a Class 1 misdemeanor.

47.     Defendant's assertion that the Game is an illegal gambling device is at odds with the irrebuttable fact that the Game is skill-based, and that success or failure in playing the game hinges on the skill of the player, and is not "depend[ent] upon elements of chance." Va. Code § 18.2-325(3)(b). As such, the Game cannot be a gambling device and cannot be subjected to criminal penalty.

48.     While Plaintiffs contend that the Game is clearly a legal skill game under Virginia law, the variance between prior Attorney General opinions, the ABC's review of the Game, and the legal and technical analysis of the Game on the one hand, and Defendant's "determination," on the other hand, is suggestive of one of two things. Either Defendant's determination exceeds the authority of the Office of the Commonwealth's attorney by improperly legislating or adjudicating – and fundamentally redefining – what comprises an illegal gambling device under Virginia law by reading the language "depending upon elements of chance" out of Va. Code § 18.2-325(3)(b). Or, it means that the statutory definitions of gambling and/or an illegal gambling device violate due process under the Virginia Constitution because they are unconstitutionally vague as applied to Plaintiffs and the Game's status as a legal game of skill or an illegal gambling device.

49.     Whether Defendant ultimately prosecutes any retailer with the Game is immaterial. The upshot of his decision is to deprive Plaintiffs of their liberty and property rights guaranteed by the Virginia Constitution by threatening any person that contracts with Plaintiffs with prosecution, thereby foreclosing the ability of Plaintiffs to transact the legal business of distributing skill game machines in the City of Charlottesville, forcing Plaintiffs out of business, and subjecting Plaintiffs' property – terminals containing the Game – to imminent unjust seizure and civil forfeiture under Va. Code § 19.2-386.30.

12

50.     Moreover, there is no pending criminal prosecution against Plaintiffs in which they can defend their interests. In fact, retailers in Charlottesville no longer operate the Game in their establishments because of Defendant's "determination." Thus, if no retailer risks prosecution, then Plaintiffs are without an adequate remedy at law to challenge Defendant's interpretation of the relevant gambling statutes, notwithstanding a clear legal right to operate the Game in the Commonwealth under Virginia gambling law as understood and applied by the Office of the Attorney General for decades.

51.     Defendant's actions unjustly threaten not only Plaintiffs' property rights, but their ongoing business interests in the Commonwealth, as well.

## COUNT I

**Violation of the Due Process Clause of the Virginia Constitution – Declaratory Judgment**

52.     Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

53.     Defendant's press release threatening criminal prosecution to any retail location housing the Game in Charlottesville violates Article I, Section 11 of the Virginia Constitution because it deprives Plaintiffs of their fundamental liberty and property rights by foreclosing Plaintiffs' ability to transact the legal business of distributing skill game machines in the Commonwealth, forcing Plaintiffs out of business, and subjecting their property – terminals containing the Game – to unjust seizure and civil forfeiture under Va. Code § 19.2-386.30.

54.     Defendant's actions under color of state law, including the issuance of a press release "declaring" the Game to be illegal, amount to a deliberate misapplication of the Virginia gaming statutes to a legal skill game, for the purpose of harassing and/or arbitrarily interfering with Plaintiffs' right to conduct their chosen trade within the parameters of the law.

55.     Defendant's interpretation of the gaming statutes is plainly at odds with prior Attorney General opinions and the ABC review of the Game. As applied to Plaintiffs and under Defendant's "determination," Va. Code §§ 18.2-325 and 331, which define "illegal gambling" and "gambling device" and prohibit the illegal possession of a gambling device, respectively, are void for vagueness. Defendant's interpretation of the gaming statutes leaves Plaintiffs and the retailers with which they contract to speculate at peril of indictment whether their conduct with respect to the Game is prohibited because the necessary level of skill to avoid prosecution thereunder is unclear, if one accepts Defendant's interpretation. Defendant's actions effectively read out the "depending upon elements of chance" language in the definition of gambling device, leaving both Plaintiffs and their retailers without guidance as to the level of skill or chance required in a game to avoid prosecution under the gaming statutes.

56.     Moreover, the gaming statutes, as interpreted by Defendant, both facially and as applied to Plaintiffs, do not provide a person of ordinary intelligence fair notice of the amount of skill required for an electronic skill game to avoid being designated as an illegal gambling device.

57.     Retail locations with which Plaintiffs contract to host the games face criminal fines and jail time if the Game is deemed an illegal gambling device. However, Plaintiffs' themselves face deprivation of their property and contract rights, and their fundamental right to pursue an occupation and transact business in accordance with state law, without due process of law because Defendant's threatened prosecution has compelled and will continue to compel retail locations to remove the Game from their establishments and Game terminals, which are owned by Plaintiffs, are subject to unjust seizure and civil forfeiture if they are not so removed, and if Defendant's erroneous "determination" goes unchallenged. Va. Code § 19.2-386.30.

14

58.     The vagueness has caused Plaintiffs' irreparable injury already insofar as retailers in the City of Charlottesville no longer operate the Game in their establishments, causing significant loss of revenue to Plaintiffs.

59.     Defendant's actions are demonstrative of how the vagueness of the statutes as applied to Plaintiffs and their retailers leaves them open to entirely arbitrary and selective enforcement by Virginia's Commonwealth's attorneys.

60.     An actual, justiciable controversy exists with respect to the application of the gaming statutes to the Game, and declaratory relief is appropriate.

61.     The objective in this declaratory judgment proceeding is not to determine a disputed issue of fact because *how* the game operates is indisputable. It always operates as designed by the proprietary and patented software code that governs the Game. Thus, the only question at issue in this proceeding is an adjudication of the parties' rights.

62.     Plaintiffs, in requesting a declaratory judgment, seek relief from the uncertainty and insecurity attendant upon controversies over their legal rights, without risking criminal prosecution, or the seizure of their lawfully-owned property.

63.     While Plaintiffs, which own the games, have not been prosecuted for distributing the Game in Virginia, Defendant's press release and ultimatum to their retailers have irreparably harmed and will continue to irreparably harm Plaintiffs' property and liberty rights by subjecting Plaintiffs' Game terminals to seizure, and foreclosing Plaintiffs from pursuing a lawful trade within the Commonwealth of Virginia.

64.     Plaintiffs will lose and have already lost thousands of dollars in business revenue as a result of Defendant's unilateral and legally unsupported announcement of his "decision" to ban Plaintiffs' skill-based Game.

65.     Plaintiffs have no forum in which to assert the legality of the Game and safeguard their property and liberty rights if they cannot bring an action for declaratory relief.

66.     Plaintiffs have a clear right to relief because skill determines the outcome of the Game, and, accordingly, it cannot be an illegal gambling device by the plain language of Va. Code § 18.2-325(3).

67.     The Game is played the same way at all times, is not connected to the Internet, and is not modifiable by retail locations hosting the game or any other third parties. There is no factual dispute as to how the game is played. The sole question to be addressed by the requested declaration is one of law, not fact.

68.     Plaintiffs' request would not require the Court to issue an improper advisory opinion. Defendant's threatened prosecution and his issuance of a press release "declaring" the Game to be illegal has had a chilling effect on locations in the City of Charlottesville that previously offered the Game. Retail locations have removed Game terminals from their establishments as a direct result of Defendant's threatened prosecution, which remains outstanding.  As a result, the threat of prosecution looms over Plaintiffs' lawful business and forecloses Plaintiffs from offering the Game – a legal skill game that does not run afoul of the Virginia gaming statutes – indefinitely, and for so long as Plaintiffs' rights are not clarified by a court of competent jurisdiction.  Defendant's misapplication of the Virginia gaming statutes has deprived Plaintiffs of a liberty interest guaranteed by the due process clause of the Virginia Constitution

69.     Therefore, Plaintiffs are entitled to a declaratory judgment that the Game is not an illegal gambling device because it is a skill game the outcome of which is determined predominantly by the player's skill with pattern recognition and memory retention.

## COUNT II

### Writ of Prohibition

70.  Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

71.  Plaintiffs have been injured and will continue to be injured if Defendant's position with respect to the application of the gambling statutes to the Game is left unchallenged.

72.  Defendant's "determination" that the Game is an illegal gambling device is at odds with the plain language of the relevant statues, decades-old Attorney General Opinions that have not been overturned by statute, case law, or subsequent advisory opinion, and common sense.

73.  Defendant's "determination" exceeds his jurisdictional authority as a Commonwealth's attorney to enforce the law and amounts to impermissible legislation and/or adjudication of Plaintiffs' rights.

74.  Defendant's press release has caused retailers that host the Game, with which Plaintiffs' contract, to remove the Game from their establishments and has functioned as a de facto adjudication of the illegality of the Game, which is not subject to challenge absent the entry of a declaratory judgment, injunction, or writ of prohibition by this court.

75.  Plaintiffs have a clear right to relief insofar as the Game is a skill game and not a gambling device. It plainly does not amount to illegal gambling under Virginia law because its operation does not *depend* upon elements of chance. Therefore, its presence in the Commonwealth is lawful.

76.  Plaintiffs lack an adequate remedy at law. Without the issuance of a writ of prohibition from this Court, suspending Defendant's erroneous criminal enforcement of the

Virginia gambling statutes as against retailers hosting the Game, Plaintiffs are without an avenue to effectively protect their property rights.

77.     Plaintiffs have a clear right to the issuance of a writ of prohibition against Defendant. There is no factual dispute as to how the Game operates, and as constituted, it is a skill-based game the outcome of which is not dependent on chance, and it does not violate Virginia's gaming statutes.

78.     Defendant has a legal duty to prosecute felonies and the discretion to prosecute misdemeanors arising in the City of Charlottesville. *See* Va. Code § 15.2-1627(B). His authority does not extend to the de facto creation of new legislation with respect to the legality of skill games in the Commonwealth, nor does it extend to the adjudication or authority to *determine* whether or not the Game is an illegal gambling device.

79.     Defendant's threatened prosecution of the retailers that host the Game is *ultra vires* and Plaintiffs are entitled to a writ of prohibition suspending Defendant's *ultra vires* enforcement of Virginia's gaming laws against the Game.

## <u>COUNT III</u>

### Request for Temporary and Permanent Injunctive Relief

80.     Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

81.     Temporary injunctive relief is necessary to preserve the status quo ante pending litigation.

82.     Moreover, Plaintiffs have been and will continue to be irreparably harmed absent the issuance of a temporary and permanent injunction

83.     Plaintiffs have no adequate remedy at law.

18

84.     Defendant will not be harmed if a temporary and/or permanent injunction is granted.

85.     Plaintiffs are likely to succeed on the merits.

86.     The public interest in the consistent application of the criminal statutes and the principle that no one should be required at peril of life, liberty or property to speculate as to the meaning of penal statutes is served by the issuance of a preliminary and/or permanent injunction.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a declaratory judgment in Plaintiffs' favor that:

    a. The Game is not an illegal gambling device;

    b. Defendant has violated Plaintiffs' due process rights under the Virginia Constitution by unilaterally announcing in a press release his "decision" that Plaintiff's skill-based game is unlawful and banned from the City of Charlottesville;

    c. Alternatively, Va. Code §§ 18.2-325 and 331 are unconstitutionally void for vagueness under the Virginia Constitution as applied to Plaintiffs and/or the Game by Defendant;

B. Issue a writ of prohibition suspending Defendant from prosecuting the Game as an illegal gambling device insofar as the threatened prosecution is *ultra vires*;

C. Enter a temporary and permanent injunction prohibiting Defendant from prosecuting the Game as an illegal gambling device insofar as the threatened prosecution is *ultra vires* and/or unconstitutional under the Virginia Constitution;

D. Order Defendant to rescind or correct his "press release" which purported to declare Plaintiffs' skill-based Game illegal and banished from Charlottesville; and

E. Award Plaintiffs all such further relief as it deems just and equitable.

Dated: December 4, 2019

Respectfully submitted,

/s/ Jason C. Hicks, Esq.
Jason C. Hicks, VSB # 46961
Ian R. Dickinson, VSB # 92736
WOMBLE BOND DICKINSON US, LLP
201 E. Main Street, Suite P
Charlottesville, VA 22902
Tel: 202-857-4536
Fax: 202-261-0013
Jason.Hicks@wbd-us.com

Anthony F. Troy, VSB # 05985
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
919 E. Main Street, Suite 1300
Richmond, VA 23219
Tel: 804-788-7751
Fax: 804-698-2950
ttroy@eckertseamans.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 4th day of December, 2019, a true and exact copy of

the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF

system, which will send a notification of such filing (NEF) to the following:

David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
M. Scott Fisher, Jr. (VSB No. 78485)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
sfisher@hccw.com
*Attorneys for Defendant*

*/s/ Jason C. Hicks, Esq.*
Jason C. Hicks, Esq.